THORN *v.* DAVIS.

Opinion delivered November 5, 1917.

BILLS AND NOTES—ALTERATION—EFFECT—INTENTION.—The effect of an alteration in a written instrument depends upon the nature of the alteration, the person by whom made, and the intention with which it is made; where neither the rights, interests, duties or obligations of any of the parties is changed in any manner, the alteration will be considered as immaterial.

Appeal from Craighead Chancery Court, Western District; *Chas. D. Frierson,* Chancellor; affirmed.

*Baker & Sloan,* for appellant.

1. The part payment on the two notes was not sufficient to take them without the operation of the statute of limitation. The evidence shows that the payments were not made. The notes were barred. The proof shows that the alleged payments were not made, if at all, until the notes were barred, and it is nothing more than a self-serving statement made by Davis or his agent and is therefore not competent evidence for any purpose. 44 Ark. 532; 14 *Id.* 213; 9 *Id.* 455; 12 *Id.* 775; 18 *Id.* 531; Ann. Cas. 1913-A, 1219.

2. The signing of the note as surety without the consent or authority of the maker and the subsequent payment thereof by such self-constituted surety was a voluntary payment and the addition of such signature to the note constituted a material alteration of the instrument and avoided it. 9 Ark. 122; 5 *Id.* 277; 33 *Id.* 771; 35 *Id.* 146; 32 *Id.* 166; 2 Am. & E. Enc. L. 232.

*N. F. Lamb,* for appellee.

1. The notes were not barred. Payments are endorsed on both, and they are valid endorsements. The evidence shows actual payments and valid endorsements

thereof on the notes. 44 Ark. 532; 79 *Id.* 393-5; 16 Cyc. 791. ·

2. The signature by Davis to the $1,500 note was not a material alteration and did not avoid it. It did not affect anybody's liability. 2 Corp. Jur. 1173, § 2, 1219, § 83; 112 U. S. 139; 2 Cyc. 222; 1 R. C. L. 982; 96 Ala. 189; 80 Ga. 200; 148 Ill. 349; 50 Neb. 16; 31 *Id.* 165.

WOOD, J. This suit was instituted by the administrator of the estate of F. G. Keich against W. T. Thorn and others to foreclose a mortgage executed by Thorn and wife to Keich to secure an indebtedness of $1,000. Davis was made a party defendant on account of the alleged existence of a second mortgage executed by Thorn and wife to him. He filed a cross-complaint against Thorn and wife, setting up, in substance, that on November 20, 1906, W. T. Thorn had executed to Davis a note in the sum of $950, due November 20, 1907, and that on March 19, 1908, Thorn had executed his note to Davis in the sum of $950, due January 1, 1909; that on December 31, 1913, Thorn had executed his note to the Jonesboro Trust Company in the sum of $1,500, payable one year after date, which the Jonesboro Trust Company, in due course, had sold to Davis.

Without setting up in detail the answer of Thorn to the cross-complaint of Davis, it in substance alleged that the note for $1,000 and the note for $950 were barred by the statute of limitations of five years, and that the $1,500 note was signed by Davis as surety without the authority and consent of Thorn, the maker, long after the date when the note was executed by Thorn and his wife to the trust company and that such signature was an unauthorized and unwarranted act on the part of Davis; that the payment of the note to the trust company by Davis was therefore voluntary and that he could not recover on same against the makers.

The testimony is substantially as follows:

The notes executed respectively November 20, 1906, and March 19, 1908, each bear an endorsement showing

that the sum of $10 was paid on each note on November 1, 1911. The appellants contend that these payments were not made by them, and that the endorsements were therefore not valid.

The assistant secretary of the Jonesboro Trust Company testified that he entered the endorsements of the payment of $10 on each of the notes; that Thorn and Davis came in the bank and explained that they wanted to make a payment on the notes. He got the notes and the money. Davis was keeping the notes in the bank at the time. Thorn handed witness the money, and witness got the impression that Thorn got the money from Davis. The purpose of the payment, as he gathered from what was said at the time, was to keep the notes from running out, from being barred by the statute of limitations. Witness' recollection was that Thorn said that he borrowed the money to make this payment on the notes from Davis, or else Davis said he would loan the money to Thorn. Witness would not be right positive that the date of November 1, 1911, was the correct date, but was reasonably sure that it was either that date or about that time. The language of the witness on this point is, "My impression now is that the date is correct, but I have no way of fixing the date absolutely. It might have been a day or two, or three days after that." Again, "It is possible it might have been four years ago. I am pretty sure it was only a short time from the date that is on the notes there. I handle a great many notes at the bank and do not pretend to charge my memory with the actual date of particular occurrences."

Davis testified concerning these payments, in substance, as follows: That he called Thorn's attention to the notes and suggested that he had better make a payment on them. Thorn said that he would like to pay them off but did not have the money. Davis told him that he would loan him the money to go in the bank and make the payment on them. They went in the bank, and Armstrong, the cashier, got the notes. As they were walking from the door to the window Davis gave Thorn the $20.

Thorn handed it to the cashier. Davis told the cashier that he would loan the money to Thorn. Davis and Thorn several times talked about the notes becoming barred if the payment was not made. The real purpose and intention on the part of Davis and Thorn with reference to the loan of the $20 by Davis to Thorn on the occasion mentioned, and the payment by Thorn on the notes was to renew the notes, that is, give them new life, to keep the statutes of limitations from running. Witness had no recollection of other than the date that appears on the notes about the time when the payments were made. Witness did not instruct the cashier, who endorsed the payment on the notes, to date the payments back, and did not hear Thorn tell him to do so. The date, November 1, 1911, was the correct date so far as witness knew.

Thorn testified that the note of November 20, 1906, and the note of March 19, 1908, had never been renewed or paid in any way, and that they were still in life unless barred by the statute of limitations. He never paid the $10 endorsed on each of the notes. He explains how this took place, as follows: Davis asked witness to go over to the bank a minute. He did not say what he wanted and witness had no idea. He went to the bank teller's window and told Mr. Armstrong to hand him his notes. Davis said, "You haven't got any money, have you?" This made witness a little angry, and he stepped back a bit. Davis threw two bills in the window. Witness did not know what the amount was. Witness heard the cashier say, "I don't believe that will constitute a credit." Davis said it would. "The pretended credit is dated November 1, 1911. I just had cashed this check here at the First National Bank for $242. I did not ask Davis to let me have any money to pay on the notes." Davis and witness went to the bank on June 5, 1914, and there never was any other time when witness went there with Davis.

John Russell Lane testified that there was a notation on the mortgage record showing the mortgage from Thorn to Davis, as follows: "The within mortgage is credited with $10, November 1, 1911," signed "C. H. Da-

vis, A. B. Lane, clerk, by John R. Lane, deputy." Witness was present at the time the writing was done and Davis requested the notation to be made this way. Witness thought the notation was placed there some time in June, 1914. Davis said that $10 had been paid along in November, and he made the entry on the record to correspond with what he said was the date of the payment of the money.

The court found that Thorn had paid the $10 on the $950 note of November 1, 1911; also that on the same date he paid the sum of $10 on the $1,000 note.

The finding of the chancellor is sustained by the preponderance of the evidence. The testimony of the cashier and of Davis to the effect that the payment was made by Thorn November 1, 1911, under the circumstances detailed by them, is not overcome by the testimony of Thorn to the contrary, nor by the testimony of the clerk showing that under the direction of Davis he entered on the margin of the record of the mortgages a credit for $10 as of November 1, 1911, but that these entries were not made until some time in the summer of 1914. The clerk testified that Davis at the time he requested him to enter this notation said that the payments had been made along in November, and that the entry was made on the record "to correspond with what Davis said was the date of the payment of the money." This tends to show that Davis had neglected to enter the credits on the margin of the record of the mortgages on the date when the payments were made, but it does not contradict the testimony of Davis to the effect that the payments were in fact made November 1, 1911, the date appearing on the notes. The notes respectively for $950 and $1,000 are therefore not barred by the statute of limitations.

Concerning the alleged unauthorized alteration of the $1,500 note, Armstrong testified that this $1,500 note was executed in collection of a previous note of Thornton upon which Davis was surety. The $1,500 note was executed to the trust company by Thornton, but there was never any agreement entered into with Thornton or Davis that

··Davis should be released upon any of the indebtedness. Witness' understanding was that Davis would endorse the Thorn note as surety. Witness thought that not over a week elapsed after Thorn signed the note before Davis came in and signed it.

Davis testified that he was not at the bank when Thorn signed the $1,500 note, and did not remember how long it was after the date of the note before witness signed it. His understanding was that the $1,500 note took up other notes of Thorn that witness had signed as surety. The bank had never entered into any agreement that witness was to be released from the indebtedness. The $1,500 note was merely a renewal of the old obligation upon which witness was surety and to the same extent of the $1,500 note.

The secretary of the trust company, who wrote the $1,500 note, said that he did not presume there was any agreement on the part of the trust company that Davis' personal obligation on the indebtedness should be released. Davis and Thorn did not sign the note at the same time. The $1,500 note was given in payment of another note of Thorn to the trust company which Davis had signed as surety.

Thorn testified concerning the $1,500 note as follows: "He (Davis) never spoke to me about any of these notes except the $1,500 note payable to the Jonesboro Trust Company. This note has been renewed once or twice. Davis told me that they were cutting up about that note at the bank, and I said that I would see what I could do about it. I went down to Mr. Mason and asked if they would renew this note and take the mortgage themselves, that is, let me make the mortgage direct to the bank, instead of to Davis as security. The note I signed was dated December 31, 1913, and made in the bank at the time. I did not know that Mr. Davis' name was on this note until some time in December, 1914. I did not ask him to go to the bank and pay any portion of this debt. I did not know he had taken up this note until Mr. Lamb showed it to me." He further testified that when he gave

the $1,500 note to the bank the bank did not say that it intended not to have Davis on it as surety. It was witness' idea to get Davis off of it. "It wasn't proper for Davis to sign it because I carried him this note and tore his name off and handed it to him. He couldn't have thought he was a surety on it when I gave him his signature. I got the old note with Davis' name on it on the 31st of December, 1913, the same day as the renewal note for $1,500 was made to the bank without Mr. Davis' name on it. It was a few days after that that I showed Mr. Davis the old note with his signature off of it and he didn't say anything about signing any notes for me."

From the above testimony it clearly appears that Thorn executed the $1,500 note in payment of prior indebtedness to the trust company on which Davis was his surety, and that there was no intention upon the part of the trust company to release Davis as surety on this indebtedness, and the note was manifestly signed by him as surety in recognition of his obligation as such on the notes which the $1,500 note was given to pay. Even though this may have been done without the knowledge or request of Thorn, it did not in any manner affect the liability of Thorn to the trust company on the note.

In *Mersman* v. *Werges*, 112 U. S. 139, 142, it is said: "Where the signature added, although in form that of a joint promisor, is in fact that of a surety or guarantor only, the original maker is, as between himself and the surety exclusively liable for the whole amount, and his ultimate liability to pay that amount is neither increased nor diminished; and, according to the general current of the American authorities, the addition of the name of a surety, whether before or after the first negotiation of the note, is not such an alteration as discharges the maker." The authorities to this effect are collated in 2 C. J., p. 1219, n. 1. See, also, 1 R. C. L. 982; *Miller* v. *Finley*, 26 Mich. 249. This is well settled by our own court, as well as the authorities generally.

Of course, any material unauthorized alteration that affects the liability of the maker of the note, by increas-

ing or decreasing the same, would invalidate the contract. See *Overton* v. *Matthews,* 35 Ark. 147, and other cases cited in appellant's brief.

But such is not the case here. The signing of the $1,500 note by Davis did not change the contract of appellant Thorn to the trust company in any essential particular. It neither increased nor diminished his liability as the maker of the note.

It was held in *Ryan* v. *Springfield First National Bank,* 148 Ill. 349, that "the effect of an alteration in a written instrument depends upon the nature of the alteration, and the person by whom and the intention with which it was made. If neither the rights nor the interests, duties or obligations of either of the parties are in any manner changed, an alteration may be considered as immaterial."

The decree is therefore correct, and is, in all things, affirmed.